**In re Anonymous No. 33 D.B. 78**

Disciplinary Board Docket no. 33 D.B. 78.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

HENRY, *Board Member*, July 9, 1979—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Disciplinary Board of the Supreme Court of Pennsylvania (board), submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS

This matter arises under a petition for discipline that was filed on July 12, 1978, alleging that respondent attorney commingled a client's funds with his own and converted them temporarily for his personal use in violation of Disciplinary Rules 1-102(A)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation), 6-101(A)(3) (neglect of a legal matter entrusted to him), 9-102(A) (commingling of funds), 9-102(B)(3) (rendering appropriate accounting) and 9-102(B)(4) (failure to promptly deliver a client's funds to him). No answer was filed and the matter was referred to the hearing committee. A pre-hearing conference was convened on October 31, 1978, which respondent did not attend. A hearing on the charges was held

on November 8, 1978, at which respondent represented himself. Following an initial determination that respondent had violated all of the disciplinary rules set forth in the petition for discipline except Rule 1-102(A)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation), the committee reconvened on April 4, 1979, to hear additional testimony with respect to the type of discipline to be imposed. The hearing committee filed its report on May 4, 1979, recommending 60 days' suspension followed by probation for one year. A brief on exceptions was filed by the office of disciplinary counsel requesting a suspension for one or more years. No brief opposing exceptions was filed by respondent and the matter was referred to this board for review and recommendation to your honorable court.

## II. FINDINGS OF FACT

The findings of fact and conclusions of law by the hearing committee are supported by the evidence and adopted by this board. For the convenience of the court, these findings are set forth below together with additional findings primarily with respect to respondent's past disciplinary history which we believe to be relevant.

1. Respondent was retained by [A] to represent him in the sale of real property known as [ ], [ ], Pa.

2. Respondent was present on behalf of [A] during the real estate settlement held on October 7, 1977, in the office of the [Title Insurance Company].

3. Respondent on November 11, 1977, sent a letter to [B], the title settlement clerk, advising her he was still holding the $2,997 in escrow and inquiring

whether the outstanding charges had been satisfied. Subsequently, [B] telephoned respondent several times to advise that there was no reason to escrow said funds. Respondent ignored her telephone messages and did not return her telephone calls.

4. Respondent, other than the letter of November 11, 1977, did not contact the [Title Insurance Company] and did nothing to determine whether or not the taxes and other outstanding charges were satisfied.

5. Respondent neglected to return many telephone calls of [A] in which he asked for an accounting and return of the $2,997 held in escrow. [A] conversed with respondent by telephone in December of 1977, at which time respondent advised [A] that the escrowed funds would be released to him. The escrowed funds were not released as promised.

6. In January, 1978, [A] requested his real estate broker, [C], to assist him in obtaining the $2,997 held by respondent and [C] thereafter made several telephone calls to respondent demanding release of the escrowed funds.

7. Respondent failed to return telephone calls of [C] concerning this matter and failed to respond to a letter and mailgram sent by [C] to his attention requesting the return of the moneys, except on February 14, 1978, respondent did return a telephone call.

8. On February 14, 1978, respondent advised both [C] and [A] that the moneys would be sent to [A] by February 17, 1978.

9. On March 21, 1978, [A] received a check in the amount of $2,997; the letter was postmarked March 16, 1978.

10. Respondent has not provided an accounting to [A] of the location or use of the moneys he held from October 7, 1977 until March 16, 1978.

11. Respondent failed to maintain the $2,997 of [A] in an escrow account and failed to provide [A] with any evidence of the escrow account.

12. Respondent commingled the $2,997 of [A] with his own funds.

13. During the real estate settlement for [ ], held on October 7, 1977, the settlement clerk, [B], never requested respondent to hold any moneys in escrow.

14. [B], the settlement clerk, left telephone messages with respondent after she received the November 11, 1977 letter of respondent; the messages indicated there was no need to hold any moneys and there were no outstanding charges. Respondent did not return her telephone calls.

15. Respondent admitted at all pertinent times he knew the $2,997 he was holding for [A] should have been placed in an escrow account, yet he placed the moneys in his personal bank account which at certain times reflected balances below $2,997.

16. The physical illness of respondent's wife commenced in 1971 or 1972.

17. The mental and emotional problem of respondent's son commenced in 1973.

18. Respondent throughout his son's and wife's illness has been engaged in the active practice of law.

19. There were adequate funds in respondent's bank account to cover the amount owing to [A] in October and November of 1977 and from January 30, 1978 to February 9, 1978.

20. The low balance in said account was $621.

21. On May 31, 1977, respondent received two informal admonitions from chief disciplinary counsel both of which cases involved failure to proceed after receiving retainers from his clients.

22. A petition for discipline was filed against respondent to no. 32 D.B. 77 on August 17, 1977, involving neglect of two separate matters. Hearings were held on November 15, 1977 and January 19, 1978. In September of 1978, the hearing committee filed its report recommending private reprimand. On December 19, 1978, this board filed an opinion recommending public censure which recommendation was adopted by your honorable court on January 1, 1979 (No. 212 DD No. 1). The censure was administered on April 16, 1979.

## III. DISCUSSION

The commingling of a client's funds with an attorney's own funds and the use of those moneys for the attorney's personal purposes is an extremely serious offense. There are other aspects of this particular case, however, that make respondent's conduct even more disturbing. These arise from the facts established by the testimony that [Respondent's] actions took place while he was involved in other disciplinary proceedings. A petition alleging two separate instances of serious neglect was filed in August of 1977. The first hearing was held on November 15 of that year. The settlement of the real estate transaction which was the basis for the instant charges took place in October of 1977, and in November, respondent had been advised by the settlement clerk that there was no need to retain

any of his client's funds. During this period of time respondent had adequate funds to pay [A's] money to him. On January 19, 1978, at the second hearing on the previous charges, [Respondent] told the hearing panel:

"But frankly, I have to admit that I did not give these cases the proper attention that they deserved. I lost a lot of sleep over it, gentlemen. Many times I lay awake in bed and felt very badly about it. I am also unhappy about the inconvenience that all of you are suffering because of my mistake."

At the time [Respondent] made these remarks, he was aware of the fact that he had used [A's] funds for his own purposes. Shortly thereafter, from January 30 to February 9, 1978, respondent had $7,270 in his bank account, more than enough to reimburse [A]. Notwithstanding his appearance before a hearing committee less than two weeks before, he still did not take advantage of the opportunity to meet his professional obligations. The only conclusion that can be drawn from these circumstances is that [Respondent's] representations to the hearing committee were only calculated to minimize the discipline imposed in the case they were considering and not an indication of his actual state of mind.

The board is aware of the fact that [Respondent] has been beset with very difficult personal problems arising from the illnesses of his wife and son. Normally these would be considered mitigating circumstances of considerable weight. However, [Respondent's] conduct has severely prejudiced his clients and the personal problems are continuing. There is no assurance that his past pattern of conduct will not also continue since the reasons he has

given for the same still prevail. When the mitigating facts are balanced against the potential harm to current and future clients, the decision must be made in favor of protecting the public.

The hearing committee recommended that respondent be suspended from practice for 60 days and then placed on probation for one year.* The purpose of the suspension was to "bring home to the respondent the severity of his improper conduct to the end that hereafter he will observe all of the provisions of the Code of Professional Responsibility with fidelity . . . (and that) he may use the time to do what he can to put his personal affairs in order." The probation was imposed because "in respondent's case it is essential to the interest of his clients that surveillance be kept over his activities for a period of time."

This board recently stated:

"Since the fall of 1976, probation has been used sparingly. It has proved to be workable and effective where an attorney's difficulties stem from physical or mental problems and he is capable of handling his professional affairs when these conditions are under treatment. In these instances, the terms of probation consist of a prescribed program of medical or psychiatric care. Probation has only been imposed on one occasion where these problems were not the controlling factor. The reasons for our reluctance in this regard are the myriad problems attending its implementation including, but not limited to, the recruiting of volunteer

---

*There is no express provision in the Rules of Disciplinary Enforcement at this time providing for suspension followed by probation. See Rule 204.

monitors, the establishment of effective guidelines and the difficulty of evaluating the results. *Paramount, however, has been the concern as to whether or not probation can work when imposed upon a respondent without his voluntary acceptance since his cooperation is so essential for success* . . . However, unless the attorney exhibits some interest by taking the initiative to suggest the type of program and responsible monitors to assist him, this board is reluctant to recommend probation. *When the attorney has not demonstrated a positive attitude and the charges are serious, it would seem that it is better to impose a suspension which will compel him to seek the necessary help prior to reinstatement rather than take the time of professionals and volunteers to develop and administer a program that has very little real chance of success.*" In re Anonymous No. 24 D.B. 78, 11 D. & C. 3d 419 (1979). (Emphasis supplied.)

From the board's review of the record in this case, including the manner in which [Respondent] approached these proceedings, we are greatly concerned as to whether or not he would be an appropriate candidate for probation based upon the criteria set forth in our previous opinion. It is our view that the burden should be placed upon [Respondent] to work out a program for his future practice that will assure that his prior transgressions will not be repeated. He should be required to establish this through the reinstatement process. [Respondent] would have the opportunity at that time to outline the reforms and controls he intends to implement to avoid the problems that have plagued him in the past. The nature of [Respondent's] misconduct is such that this board feels that no extensive suspension is required but only the time necessary to permit him to set up a feasible arrangement

that will assure that the public will not be harmed again by his return to his professional activities. Since, under the rules, a suspension of three months or less results in an automatic reinstatement, this board recommends to your honorable court that [Respondent] be suspended from practice for a period of not less than four months.

## IV. RECOMMENDATION

For the reasons set forth above, Disciplinary Board recommends to your honorable court that respondent, [ ], be suspended for a period of not less than four months with the right to apply for reinstatement pursuant to Rule 218 of the Pennsylvania Rules of Disciplinary Enforcement at any time and that respondent shall comply with all of the provisions of Rule 217 of the Pennsylvania Rules of Disciplinary Enforcement and section 91.91-97 of the Rules of the Disciplinary Board.

## ORDER

EAGEN, *C.J.*, And now, August 22, 1979, the report and recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated July 9, 1979, is hereby accepted; and it is ordered, that [Respondent] of [ ] county, be, and he is forthwith suspended for a period of not less than four months with the right to apply for reinstatement pursuant to Rule 218 of the Pennsylvania Rules of Disciplinary Enforcement at any time he complies with Rule 217 of the Pennsylvania Rules of Disciplinary Enforcement and Section 91.91-97 of the Rules of the Disciplinary Board.

Mr. Justice Roberts and Mr. Justice Larsen would enter an order of suspension for six months.